# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-*against*-

Case No. SDNY 1:21-CR-00603-VEC-10

JAMARIO MOON

*Defendant.*

## SENTENCING MEMORANDUM

LaMarche Safranko Law, PLLC
*Attorneys for Defendant*
987 New Loudon Road
Cohoes, New York 12047
(518) 982-0770

Andrew R. Safranko, Esq.

Dated: October 18, 2022

# TABLE OF CONTENTS

**JAMARIO MOON'S SENTENCING MEMORANDUM** ..........................................................1

**I. INTRODUCTION** ...........................................................................................................2

    **A.   WHO IS JAMARIO MOON?** ..............................................................................2

    **B.   CHARACTERISTICS OF JAMARIO'S OFFENSE** .........................................4

    **C.   SUPPORT FROM FAMILY, FRIENDS, AND COMMUNITY** ...........................5

**II. DISCUSSION** ................................................................................................................7

    **A.   LEGAL FRAMEWORK** .......................................................................................7

    **B.   A VARIANCE OF TIME SERVED WITH TWO (2) YEARS OF SUPERVISED RELEASE
IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY** ......................................9

        *1.   Seriousness of the offense & Just punishment – 18 USC §3553(a)(2)(A)* ..................10

        *2.   Deterrence – 18 USC §3553(a)(2)(B)* ........................................................................10

        *3.   Incapacitation – 18 USC §3553(a)(2)(C)* ...................................................................11

        *4.   Need to avoid Unwarranted Disparities or Similarities – 18 USC §3553(a)(6)* .........11

        **ADDITIONAL REQUESTS**............................................................................................13

        **CONCLUSION**..................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Blakely v. Washington*, 124 S.Ct. 2531 (2004).................................................................7, 11
*Gall v. United States*, 128 S. Ct. 586 (2007) ...................................................................7, 11
*Rita v. United States*, 127 S. Ct. 2456 (2007)........................................................................8
*United States v. Booker*, 125 S.Ct. 738 (2005)..............................................................7, 11
*United States v. Denardi*, 892 F.2d 269 (3d Cir. 1989)........................................................8

**Statutes**

18 U.S.C. § 3553(a) ......................................................................................................7, 8, 13
18 U.S.C. §3553.........................................................................................................1, 10, 11
18 U.S.C. §1349......................................................................................................................1

**Other Authorities**

Ellis, *Federal Prison Guidebook*, (2008-2010) ...............................................................1, 13
*Measuring Recidivism* ..........................................................................................................10
U.S. Federal Sentencing Statistics, 2020 .........................................................................11, 12
U.S. Federal Sentencing Statistics, 2021 .........................................................................11, 12
U.S.S.G §2B1.1(b)(1)(E) .........................................................................................................8
U.S.S.G §2D1.1(c)(5) ..............................................................................................................8
U.S.S.G.§1B1.4 .......................................................................................................................8
U.S.S.G §2B1.1(a)(2) ..............................................................................................................8
U.S.S.G §2X1.1(a) ...................................................................................................................8

## JAMARIO MOON'S SENTENCING MEMORANDUM

On June 28, 2022, pursuant to the signed understanding and agreement dated May 31, 2022, Jamario Moon pled guilty to Count One (1) of the superseding Indictment, generally charging a conspiracy to commit health care and wire fraud, in violation of Title 18, United States Code, Section 1349.

Jamario is scheduled to be sentenced on November 1, 2022, at 10:30 a.m. Pursuant to the U.S. Sentencing Guidelines (hereinafter "Guidelines"), Jamario has a Total Offense Level of twelve (12), and coupled with a Category I for his lack of any other criminal history, the guideline range is ten to sixteen (10-16) months imprisonment. We urge the Court, however, to adopt the sentencing recommendation of the United States Probation Office, which is a variance of time served, two (2) years of supervised release, restitution in the amount of $105,536, and the mandatory special assessment fee of $100. I submit that the circumstances of his involvement in this case, as well as his life and qualities, make such a sentence "sufficient, but not greater than necessary". *See* 18 U.S.C. §3553.

Jamario Moon is an exceptional person who has, this case aside, lived a good and honest life, as a hard worker who cares about his community and family. As the Court no doubt will see from reviewing this memorandum as well as the presentence report, Jamario holds himself to a high standard. He has accepted full responsibility for his involvement in this case, and while never minimalizing his actions, wants the Court to know that this is not the person that he truly is. He has proven his strong character in many other aspects of his life. Jamario blames only himself for his poor decision and understands Your Honor's role in fashioning a just and fair punishment. We implore the Court to empathize with him as opposed to simply reducing him to his admitted crime. Jamario wants nothing more than to make good on his promises and prove to his family, the community, and the Court, that he is the person he has shown he is and knows he

1

can be.

# I. INTRODUCTION

## A.    WHO IS JAMARIO MOON?

Jamario is a forty-two (42) year-old-man, born to Ruby and John. Ruby, living in Alabama, still works part-time after retiring from factory work. His father, John, also a hard factory worker, sadly passed away in 2012. His parents divorced when he was young. Jamario resided primarily with his mother and her parents, but he always maintained a close relationship with his father. They grew up in a small town in Alabama, and Jamario was well loved – his upbringing was free of neglect and abuse, and while they had their share of financial struggles, he always had food and shelter.

This case presents interestingly, as all the defendants share a common thread that is otherwise incredibly unique – all were professional basketball players. As the Court is aware, the amount of people who play professional sports for a living is extraordinarily rare. As is the case for someone with such unique talents, Jamario's childhood had its shares of opportunities. He attended basketball camps and after graduating high school tried some college, however he quickly left for the opportunity to begin his professional basketball career.

To be clear, though, Jamario's path to the NBA was quite different than some may expect. Jamario did not attend a big university like Duke or North Carolina, nor was he a high draft pick – in fact he came out of his small college completely undrafted. He spent the next seven (7) years going from team to team in the minor leagues of professional basketball, sometimes unpaid and sometimes paid only a few hundred dollars a week. Most of this was in, what at the time, called the NBA Development League. He played in Mobile and Huntsville, Alabama, as well as Fort Worth, Texas. Throughout this time, he did professional tryouts with NBA teams, but never made a roster. He moved on to the Continental Basketball Association in

Albany, New York where he did very well, including making the all-star and all-defensive teams. He again missed out on making an NBA roster and ended up going to Mexico to play professionally.

Interestingly, his then-girlfriend Tamara and he had a wedding date and its circumstances set. However, when his next opportunity turned out to be Mexico, Jamario knew he needed Tamara with him, and they went to the courthouse for a quick marriage instead so that she could be with him there. Now some twenty (20) years later she is still by his side.

It was after his time in Mexico that Jamario went to a three-day tryout camp with the Toronto Raptors. He was now in his later 20s. He always went into camps with a mindset that he would make the team – even when seeing those of high pedigree, from fancy colleges, competing against him. Many doubted Jamario and told him he would never obtain his goal of making the NBA. Jamario was determined to prove them wrong. He loved the game and was dedicated to it. Toronto had one (1) roster spot open. He played well on day one and the coaches were encouraging. When he was in line for dinner after day two, Coach Sam Mitchell went up to him and told him he was making the team. It barely registered with Jamario – it seemed too good to be true. When coach confirmed it, he was elated. His mother and grandma were away at the time, and he remembers calling his wife and screaming, laughing, and crying. He could not wait for his mother to return to share with her the good news. His hard work and dedication had paid off.

That said, it was not as though he was instantly wealthy. This first deal was a two-year contract, with non-guaranteed money. He had to constantly compete to keep his spot and earn his salary. He was traded to Miami and spent time in Cleveland after that. Jamario ultimately played in the NBA for various organizations until 2012.

Thereafter he continued with professional basketball through 2017. Since then, he has

3

played in the Big3 League, a 3-on-3 league consisting of mostly former NBA and international players. One thing Jamario prides himself with is that he avoided what other athletes have fallen for, such as substance abuse, or a fractured family life. He does not judge anyone else or their struggles, but he counts his blessings that he has no history of alcohol or other drug use and has always provided for his wife and children.

Turning to his family, again, Jamario married Tamara Gamble on June 6, 2006. They have been together for twenty (20) years surviving through the hardships of being apart at times so Jamario could continue and further his basketball dreams. Tamara is a homemaker for their two children, Taylin age thirteen (13) and Jalia age eight (8). They all live together in Dacula, Georgia, outside of Atlanta. They are a close family and no matter what sentence Your Honor imposes, Jamario's worst punishment will be the morning he was arrested at home and his daughters witnessing that.

## B.    CHARACTERISTICS OF JAMARIO'S OFFENSE

While nothing herein is intended to minimize the crime that Jamario has accepted responsibility for, as the presentence investigation report recognizes, his involvement was modest. He was by no means involved in forming or leading the scheme. He never wished to hurt any other person or the fund itself but understands that the scheme went beyond just his actions. Having learned of the method of claiming funds, he submitted two requests, one signed May 7, 2018, and a year later, signed April 9, 2019. These two (2) claims totaled $105,536 dollars. Jamario fully recognizes what he did was wrong. He should have never submitted claims for dental procedures that never happened. However, like many associated in this case, he justified his actions as he was taking his own money.

His actions certainly played a role in the larger structure, and he genuinely regrets ever submitting documents and thereafter being compensated for services that he did not receive. He

4

wants nothing more than to make the fund whole, and to that end, is ready to make full restitution. Jamario intends to make the restitution payment prior to his sentencing. We submit that in comparison to others similarly situated, and on these facts, time served with supervised release is appropriate.

## C.      SUPPORT FROM FAMILY, FRIENDS, AND COMMUNITY

Jamario has incredible support from the community, family, and friends. While I am sure Your Honor will take care with each letter of support, I'll summarize some of the letters provided with this memorandum. *See Exhibit 1.*

Adalius Thomas, a friend to Jamario for over thirty (30) years, attests to Jamario's lifelong good character. He knows he is disciplined, consistent, and generous. He notes that Jamario helps raise money for local schools and donates shoes to kids in need. Of note, Adalius was one of the individuals who signed Jamario's personal recognizance bond, taking on the responsibility of having to personally pay $150,000 should Jamario have fled or otherwise attempted to avoid the jurisdiction of this Court. This denotes his full trust in Jamario.

His wife, Tamara, wrote a touching letter. Letters from a partner are often the most personal ones. She notes Jamario's character is his great quality, as he is someone that is there for her during the difficult times, just as much as he is a partner for all the good ones. Her description of his basketball journey is telling, as it describes Jamario not solely as talented, but also as an incredibly hard worker. He worked for almost a decade on his development to finally get to play in the NBA at the age of twenty-seven (27). When he was with the Cleveland Cavaliers, he won the Austin Carr "Good Guy" award, which is given to a Cavaliers player "who is cooperative and understanding of the media, the community and the public."

Shilitha Wilson, Jamario's sister, talks about two great sides of his – the funny, happy side, and the humble, kind, and respectful one. She talks about how much Jamario gives back to

5

children, and speaks about her son, Jamario's nephew Xavier, specifically. Jamario is a father-figure to Xavier, having always been in his life, and Xavier proudly made it to the NBA in the 2021-2022 season, following in Jamario's footsteps.

Bishop Gamble is the founding pastor of Faith Outreach Ministries in Alabama. He has served in public office and has a loving family – with his son-in-law being Jamario. He is so proud of Jamario's drive, determination, and perseverance. He knows his asset to the community and to his family and prays that may continue.

Coach TJ Thompson, at Rutgers University, has known Jamario for almost two (2) decades. They played professionally together. Jamario's caring nature helped him personally when his mother died, and notes how much that helped him cope. He kindly states "We need more people like him."

Terrence L. is a close friend to Jamario, commenting on how crossing paths with Jamario sticks with you for your entire life. He comments on how Jamario is a gentle soul, a great teammate, and a wonderful example to younger players.

Good friend and teammate Jawad Williams mentions that Jamario is also fun and easy-going. He talks about how during stressful times, Jamario could keep things light and enjoyable. He respects Jamario not just for what he accomplished in his professional career, but for his efforts as a father to his beautiful daughters, and as a role model to any "small-town kid who has big dreams."

Tavis Trammell has been Jamario's solid, true, and best friend since grade school. Jamario has personally pushed him to greatness every day, no matter what is going on in his life. He knows that Jamario is sincerely a stand-up person, who will live true to his word.

Terrill Brown writes in his capacity as a community member with Jamario. He volunteers as a coach at a local high school. He describes Jamario as a pilar of their community. The school

6

requires fees to play basketball to ensure proper gear for everyone, and Jamario has personally told Terrill, "Let me know every kid that's struggling to pay their dues because as a kid you shouldn't have to worry about food, shelter or if you have the money to play a sport." He doesn't want recognition or repayment for this, he simply wants to help kids.

Jamario's sister-in-law, Miranda, talks about his love and commitment to her sister and their children. He's reliable and selfless. He jokes about how both daughters are "daddy girls" and how much they look up to him in every way. Everyone knows how negative social media can be, but Miranda comments how Jamario uses his platforms to encourage and motivate the younger generation and to speak positivity into their lives.

Close family friend Anthony Montague, along with his own wife and daughters, has shared many dinners and celebrations with Jamario and his family. He discusses Jamario and his "traditional value system" which he says is about being trustworthy, responsible, work hard, and give back. Jamario exemplifies all those things.

LaBarron Simmons knows Jamario as a faithful and loyal friend for three (3) decades. He admires how Jamario is strong-minded, family oriented and dependable. He witnessed Jamario offer a cookout for his entire local city, wanting nothing in return.

In all these letters, it is impossible not to be struck by how loving and caring Jamario is to everyone in his life. He wishes to be a positive influence in every way that he can to others, and that is very personal to him. Jamario is honored to have the support of so many in his life.

## II.  DISCUSSION

### A.   LEGAL FRAMEWORK

In rendering Jamario's sentence, the Court must consider, of course, the seriousness of the crime and the guideline range set forth in the United States Sentencing Guidelines. *See* 18 U.S.C. §3553(a), *United States v. Booker*, 125 S.Ct. 738, 749 (2005), and *Blakely v. Washington*,

124 S.Ct. 2531 (2004).  The directives of *Booker*, *Gall v. United States*, 128 S.Ct. 586 (2007), *Rita v. United States*, 127 S. Ct. 2456 (2007) and § 3553(a) make clear that courts may no longer uncritically apply the guidelines, and they may not give the guidelines any greater weight than any of the other §3553(a) factors.  The Court is equally permitted to consider all circumstances and factors relevant to Jamario's sentence. *See* U.S.S.G. §1B1.4.

Without care, sentencing can fall into a mechanical or mathematical formula, removing the particulars of the person and the case. It should instead be compared to art, with an act of reason by the Court with individualized sensitivities, care, and judgment. *See generally U.S. v. Harris*, 679 F3d 1179 (9th Cir., 2012).

In every case, a sentencing court must now consider all of the §3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  Where the guidelines would conflict with other sentencing factors set forth in § 3553(a), these statutory sentencing factors should generally trump the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (arguing that since §3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

Here, the corresponding base offense level in this case starts at 6.  U.S.S.G §§ 2X1.1.(a) and 2B1.1(a)(2).  An eight (8) point increase was applied for the total loss.  U.S.S.G §2B1.1(b)(1)(E).  A corresponding two-point departure for accepting responsibility brings the offense level to 12. *See* PSI, ¶ ¶ 150-158. This equates to a guideline recommended sentence of 10 to 16 months.

I submit that a guideline sentence would not comply with the statutory directives set forth in 18 U.S.C. §3553(a).  As such, Jamario is asking this Court to look beyond the guideline range

8

and see that the person standing for sentencing is worthy of deviation from the rigid guidelines and for whom incarceration serves no purpose. Of particular note is that the probation office has reached a similar conclusion. *See* PSI, pgs. 36-42.

## B.     A VARIANCE OF TIME SERVED WITH TWO (2) YEARS OF SUPERVISED RELEASE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY

In considering his role in the crime to which he pled guilty, his overall life including his wife and two (2) young children, his criminal history, as well as his consistent compliance with pretrial supervision, I submit that the proposed variance is the proper punishment, and that further imprisonment is greater than necessary under the factors outlined in 18 U.S.C. §3553(a).

Notably, Jamario has proven himself reliable since his arrest. Originally arrested in Alabama, the Federal Magistrate authorized his pretrial release to services in that state. After a period of time, this Court authorized the moving of his family, and thereby his supervision services, to Georgia. Throughout this time there have also been requests granted that allowed his travel for the Big3 League. In this aspect the Court put its trust in Jamario and Jamario took that incredibly seriously. He was proud that he was given these considerations and he never had any issues. He wanted to prove to the Court that he was serious about doing right and that he did not take those opportunities for granted. In doing so, Jamario has proven that he can comply with all release conditions and shows what type of supervised probationer he will be if afforded the opportunity.

In coming to this request particular care and attention is brought to recommendation contained in Pre-Sentence Investigation Report *See* PSI, pgs. 36-42. With their suggestion of community service, they explicitly acknowledge that Jamario has more to offer the community in person, than incarcerated. *Id.* This is largely based on his lack of history, lack of financial issues, lack of substance abuse, and strong ties to his family and friends. *Id.* Jamario welcomes the

opportunity to continue to give back to the community.


*1.   Seriousness of the offense & Just punishment – 18 USC §3553(a)(2)(A)*

At no point has Jamario minimized his involvement in this case nor that he does not deserve some punishment for it. But as he said both to probation and in his letter to the Court, "…I genuinely want to right the wrong that I've done…[I want to] get back to raising my daughters with a clear heart. My actions in this case does not reflect the person I am…You guys will never see my name involved in anything like this again." *See* PSI, ¶ 148; *see Exhibit 2*.

So, with full acknowledgement of the above, Jamario was a modest and limited participant here. The scheme spanned four (4) years and involving $2.5 to $5 million dollars. *Id.* at ¶ 13. Those most involved are also alleged to have engaged in threats and other additional deceptive tactics. *Id.* ¶¶ 106-114. In Jamario's case, it is without argument that he was not involved in developing the scheme, and his $105,536 would amount to 0.04% at the $2.5 million amount, or 0.02% at the $5 million number. Again, while making no minimalization of his acts and the restitution he owes, such reality places Jamario in a separate and distinct situation than the scheme at large. For these reasons, a guideline sentence is extreme under these circumstances.

*2.   Deterrence – 18 USC §3553(a)(2)(B)*

Regarding deterring Jamario or others in the future, offenders committing fraud, larceny, and drug trafficking "are overall the least likely to recidivate". U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) (*hereinafter "Measuring Recidivism"*) [1] . Also, those utilizing illicit drugs have

---

[1] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

approximately twice the chance to re-offend within one (1) year after the present offense, an issue that is not part of Jamario's life. *Id.* Also, notably, offenders with a Category I criminal history, where Jamario falls, hold *by far* the lowest recidivist rates. *Id.* at Ex. 12.

As to deterring anyone else, it is unnecessary to inflate Jamario's sentence. A federal felony conviction and the embarrassment and character costs are all penalties that Jamario will suffer for his lifetime. *See generally U.S. v. Adelson*, 441 F.Supp.2d 506, 514 (SDNY, 2006) (noting the negative effect on reputation as a deterrence to future misconduct).

*3.   Incapacitation – 18 USC §3553(a)(2)(C)*

Incapacitation deals primarily with removing a dangerous person to protect society. Such a finding is anathema to Jamario's character. Society not only does not need protection from Jamario, but it is actually made better with his active participation.

Jamario actively engages with at-risk or low-income youth to spread a message of positivity and encouragement. He gives free basketball training lessons, clothing and shoes, and more whenever and wherever he can. He is presently involved in setting up a basketball league in his hometown of Goodwater, Alabama, appropriately called #ForTheLoveOfLife. One main goal is to help adults and kids alike find love with basketball and avoid the streets. People in Goodwater and surrounding communities are better when Jamario is around.

*4.   Need to avoid Unwarranted Disparities or Similarities – 18 USC §3553(a)(6)*

Within the Second Circuit in 2020, there were 365 Fraud/Theft/Embezzlement cases, which made up approximately 14% of cases. *See Exhibit 3*, U.S. Sent'g Comm'n, *Statistical Info. Packet, Fiscal Year 2020, Second Circuit, Table 5 (2020)*[2]. However, they accounted for 33% of

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/2c20.pdf

all cases that resulted in probation and alternatives and probation-only sentences. There were more of these sentences, 67 in total, than any other group of crimes. This trend continued in 2021, when again, this ground accounted for approximately 15.6% of all cases, yet accounted for 35.5% of all sentences of probation and alternatives and probation only. *See Exhibit 4*, U.S. Sent'g Comm'n, *Statistical Info. Packet, Fiscal Year 2021, Second Circuit, Table 5 (2021).*[3]

When looking at Fraud/Theft/Embezzlement with defendants eligible for non-prison sentences, the trend shows both the Second Circuit and the country at large exercising such discretion. In 2020, 781 out of 1,173 of these cases were non-prison, 66.6%. *Id.*, Table 6 (2020). In the Second Circuit, it was 30 out of 52, 57.7%. *Id.* In 2021, the national numbers remained steady, 774 out of 1,159, or 66.8%. *Id.*, Table 6 (2021). The Second Circuit saw their numbers rise slightly in line with the national ones, 50 out of 77 cases, or 64.9%. *Id.*

With regard to guideline sentencing in Fraud/Theft/Embezzlement cases, again in 2020, 40.8% of cases were granted either a downward departure (3.3%) or variance (37.5%). *Id.*, Table 10 (2020). In the Second Circuit, that number was 60.8%, with variances making up 59.2% of that number. *Id.* Those numbers were again similar in 2021, 43.4% nationally (39.6% in variances) and 58.4% in the Second Circuit (54.4% variances). *Id.*, Table 10 (2021).

What these numbers tell us is that in like cases, courts have continued to favor variances involving non-incarceration alternatives. Certainly, every case is unique, especially those that include many co-defendants to varying degrees of culpability. Jamario's circumstances cry out for similar considerations, and this would avoid any unwarranted discrepancies.

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/2c21.pdf

## ADDITIONAL REQUESTS

If the Court determines that Jamario's conduct warrants some incarceration, which for the reasons set forth herein both we and the probation department believe is not necessary, Jamario requests the Court make the following recommendations to the Bureau of Prisons. That he:

(a)     be allowed to self-surrender and report;

(b)     be assigned to a minimum-security facility; and

(c)     be assigned to such a facility as close to Atlanta, Georgia as possible so he can remain near his family.

Regarding facility determinations, we recognize that the Bureau of Prisons makes the ultimate determination.  However, the Bureau of Prisons does try to accommodate and/or honor a judge's recommendation.  *See* Ellis, *Federal Prison Guidebook*, at 2-4, 5 (2008-2010).

## CONCLUSION

For the reasons set forth herein, we request that Jamario Moon be sentenced to time served, two (2) years of supervised released on the conditions set forth in the presentence report, restitution in the amount of $105,536, and the mandatory $100 special assessment fee. Such a sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. §3553(a).  Jamario is remorseful for his actions and is committed to living an exemplary lifestyle for the community and his family and friends.

DATED:  October 18, 2022                              LAMARCHE SAFRANKO LAW PLLC

By:

Attorneys for Defendant Jamario Moon
987 New Loudon Road
Cohoes, New York 12047

13